UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

ELECTRONIC DATA SYSTEMS, LLC,

       Plaintiff,

vs.

SYNCREON AMERICA INC.,
f/k/a TDS AUTOMOTIVE U.S., INC.,

       Defendant.

CASE NO. 09-13660
HON. LAWRENCE P. ZATKOFF

_____/

## OPINION AND ORDER

AT A SESSION of said Court, held in the
United States Courthouse, in the City of Port Huron,
State of Michigan, on September 29, 2012

PRESENT: THE HONORABLE LAWRENCE P. ZATKOFF
UNITED STATES DISTRICT JUDGE

## I. INTRODUCTION

This matter is before the Court on Defendant's Motion for Summary Judgment (Docket #69) and Plaintiff's Motion for Partial Summary Judgment (Docket #92). The parties have fully briefed the Motions. The Court finds that the facts and legal arguments pertinent to the Motions are adequately presented in the parties' papers, and the decision process will not be aided by oral arguments. Therefore, pursuant to E.D. Mich. Local R. 7.1(f)(2), it is hereby ORDERED that the Motions be resolved on the briefs submitted, without this Court entertaining oral arguments. For the reasons that follow, Defendant's Motion for Summary Judgment is granted in part and denied in part and Plaintiff's Motion for Partial Summary Judgment is denied.[1]

_____

[1]The Court also DENIES as untimely "Plaintiff's Objection to Magistrate Judge's August 4, 2011 Order Regarding Defendant's Motion to Compel Discovery" (Docket #62). Plaintiff filed the Objection on August 22, 2011, however, pursuant to the Federal Rules of Civil Procedure and the Local Rules for the Eastern District of Michigan, Plaintiff was required to file any such objection on or before August 18, 2011. *See* Fed.R.Civ.P. 5(b)(2)(E), 5(d)(3), 6(a)(1); E.D. Mich. L.R. 5.1.1 and Appendix ECF. As set forth in the Magistrate Judge's August 4, 2011 Order, "[a] party may not assign as error any defect in this Order to which timely objection was not made." Fed.R.Civ.P. 72(a).

## II. BACKGROUND

Effective as of July 1, 2004, Plaintiff and Defendant entered into a Master Services Agreement ("MSA"), pursuant to which Defendant provided warehousing and logistics services to Plaintiff in connection with Plaintiff's Maintenance, Repair and Operations ("MRO") business for DaimlerChrysler Corporation ("DCC"). **Under the MRO program, Plaintiff acted as a procuring agent for DCC and purchased from third-party vendors the MRO goods to be provided to DCC. The MRO goods Plaintiff procured were not car parts, but instead related to products for factory maintenance, such as filters, oils, cleaning supplies and paper products.** Pursuant to the MSA, Defendant was required to establish and run warehouses for the MRO program. At those warehouses, Defendant was required to: (1) take possession of MRO goods which Plaintiff purchased from vendors, (2) manage and store the MRO goods until needed by DCC, and (3) then ship the MRO goods to DCC plants, as needed. **In the event DCC did not need some of those goods, Defendant was responsible for the return of the MRO goods to the vendors.**

The MSA, including "Service Order No. 01" attached thereto, contains the following relevant provisions:

A. **MSA, Section 2.03 - Performance Metrics**

Each Service Order will in addition set forth the performance metrics applicable to that Service Order. [Plaintiff's] sole and exclusive remedies for [Defendant's] failure to meet any of the performance metrics or to otherwise provide the Services in accordance with this [MSA] or the Service Order shall be as provided in the applicable Service Order.

B. **MSA, Section 3.04 - Audit Rights**

(b) Such audits shall be conducted during normal business hours and no more frequently than once in any calendar year unless [Plaintiff] is willing to pay the reasonable costs incurred by [Defendant] in connection with [Defendant] making resources and information available for such additional audit(s). [Plaintiff] will provide [Defendant] with thirty (30) days prior written notice of its request for an audit. [Defendant] will cooperate in the audit, and will use commercially reasonable efforts to (i) make the information reasonably required to conduct the audit available on a timely basis and (ii) assist the designated employees of [Plaintiff] or its auditors as reasonably necessary. Records that support [Defendant] performance of the Services and other matters relevant to this Agreement will be retained by [Defendant] in

2

accordance with Section 6.02. All information learned or exchanged in connection with the conduct of an audit, as well as the results of any audit, is confidential and shall be subject to the confidentiality provisions of Section 6.04.

C.    **MSA, Section 6.02 - Records Maintenance**

A Party shall establish and retain for a period of seven (7) years following the performance of its obligations hereunder, records which adequately substantiate the applicability and accuracy of Charges[2] payable hereunder and related expenses. Upon receipt of reasonable advance notice from a Party, the other Party shall produce such records for audit to be conducted in accordance with Section 3.04. All such records shall be kept confidential and shall be subject to the confidentiality provisions of Section 6.04.

D.    **Service Order No. 01, Attachment 1 (Statement of Work Supplier Services), Section 7.0 - Shrinkage**

(a)    [Defendant] is liable for the value of items which are received at the DC [distribution center] but are not scanned and placed into a secure delivery tote.

(b)    [Defendant] will implement a cycle count process to identify and reconcile inventory discrepancies on DCC owned inventory in the warehouse.

(c)    [Defendant] will be liable for un-reconciled shrinkage in its DCs [distribution centers].

(d)    [Defendant] to credit invoice [Plaintiff] after resolving each occurrence of shrinkage for the amount of difference.

E.    **Service Order No. 01, Attachment 4 (Performance Metrics), Section 3.0 - Rights and Remedies for Failure to Meet Performance Metrics**

[Plaintiff's] sole and exclusive remedy for [Defendant's] failure to meet any of the Peformance Metrics or to otherwise provide the Services in accordance with the Agreement or this Service Order shall be limited to (i) requiring [Defendant] at no cost to [Plaintiff] to re-perform the applicable Services to the extent necessary to correct such failure; or (ii) if remedying performance of the applicable Services is not possible, reimbursement to [Plaintiff] of any costs imposed upon it by DCC for failure to perform in accordance with Section 8 of Attachment 5; or (iii) payment of Service Level Credits. Notwithstanding the foregoing, a Service Level Failure will constitute a material breach of the Agreement and the associated Service Order for purposes of [Plaintiff's] termination rights under Section 5.02 of the [MSA].

F.    **Service Order No. 01, Attachment 5 (Miscellaneous Legal and Tax Provisions),**

---

[2]"Charges" means "[f]or the performance of Services, [Plaintiff] shall pay [Defendant] at the rates set forth in the applicable Service Order relating to such Services or as otherwise agreed upon in writing by the Parties." "Services" means "the materials management, inventory stocking, bar-coding, order execution, inventory monitoring, warehouse management, logistics and transportation management, development, education, instruction, consulting, or other services provided by [Defendant] pursuant to" the MSA.

3

**Section 5 - Audit Rights and Records**

(b) [Defendant] must maintain complete and accurate records during the Service Order Term and for a period of seven (7) years after this SO-1 is terminated. With respect to any Charges under this SO-1, [Defendant] must keep its records in accordance with generally accepted accounting principles applied on a consistent basis. In addition, [Defendant] must retain the records in accordance with DCC records retention policy, as it may be reasonably adjusted from time to time and provided to [Defendant] in writing.

Plaintiff assigned the MSA to SDE Business Partnering, LLC and SDE-MRO Express, LLC (hereinafter, collectively, "SME"), pursuant to an Asset Purchase Agreement (the "APA") between Plaintiff and SME. The APA expressly provides that the APA was effective as of January 1, 2007, but it also expressly provides that Plaintiff retained all rights and claims "arising out of or relating to events occurring prior to the Closing." The Closing of the APA occurred on March 2, 2007. Prior to the Closing of the APA, Plaintiff paid Defendant for the warehousing and logistics services Defendant performed related to the MRO program. After the Closing of the APA, SME paid Defendant for such services. **Notwithstanding the transfer of the MSA to SME, however, as part of its contracts with DCC, Plaintiff retained its order fulfillment obligations to DCC in connection with the MRO program and, as such, Plaintiff (not SME) continued to purchase MRO goods from the third-party vendors until such time as the purchasing of such goods could be fully transitioned to DCC, which apparently occurred on or about June 30, 2007. As such, third-party vendors continued to deliver such goods to warehouses operated by Defendant during this period of transition, and Defendant remained responsible for the return of those MRO goods to vendors, as necessary.**

In its Amended Complaint, Plaintiff asserted four claims: (1) Count I - Breach of Contract (breach of an express contract, *i.e.,* the MSA); (2) Count II - Breach of Contract (Third-party Beneficiary), (3) Count III - Breach of Implied Contract, and (4) Breach of Implied Contract for Bailment. All four claims stem from allegations that there were Plaintiff-owned goods: (a) Defendant received at its warehouses about which the ultimate disposition of the goods is not known; (b) Defendant asserts it shipped to DCC but for which DCC denies receipt; (c) that could

4

not be located upon physical inventory at Defendant's warehouses**; and (d) for which Defendant**

**failed to keep an accurate set of records establishing both the receipt of Plaintiff-owned goods**

**into Defendant's warehouses and Defendant's disposition of Plaintiff-owned goods, as required**

**under the terms of the MSA and pursuant to Defendant's duties as a bailee and warehouseman**

**under Michigan law.**

      **Plaintiff contends that Defendant's failures and breaches proximately caused damage**

**to Plaintiff as such failures and breaches resulted in, among other things:**

     **(1)**     **large inventory losses and discrepancies,**

     **(2)**     **the loss of the value of Plaintiff-owned goods whose disposition could not be verified,**

     **(3)**     **Plaintiff's inability to receive payment from DCC, and**

     **(4)**     **Plaintiff's inability to receive credits for returns to vendors.**

Plaintiff contends that it has suffered damages of approximately $7 million.

## III.  LEGAL STANDARD

     "The court shall grant summary judgment if the movant shows that there is no genuine

dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R.

Civ. P. 56(a).  *See also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) ("[T]he plain language

of Rule 56[] mandates the entry of summary judgment . . . against a party who fails to make a

showing sufficient to establish the existence of an element essential to that party's case, and on

which that party will bear the burden of proof at trial.").  A party must support its assertions by:

> (A) citing to particular parts of materials in the record, including
> depositions, documents, electronically stored information, affidavits
> or declarations, stipulations (including those made for purposes of the
> motion only), admissions, interrogatory answers, or other materials;
> or

> (B) showing that the materials cited do not establish the absence or
> presence of a genuine dispute, or that an adverse party cannot
> produce admissible evidence to support the fact.

Fed. R. Civ. P. 56(c)(1).  "The court need consider only the cited materials, but it may consider other materials in the record."  Fed. R. Civ. P. 56(c)(3).

The moving party bears the initial burden of demonstrating the absence of any genuine dispute as to a material fact, and all inferences should be made in favor of the nonmoving party. *Celotex*, 477 U.S. at 323.   The moving party discharges its burden by "'showing'–that is, pointing out to the district court–that there is an absence of evidence to support the nonmoving party's case." *Horton v. Potter*, 369 F.3d 906, 909 (6th Cir. 2004) (citing *Celotex*, 477 U.S. at 325)).

Once the moving party has met its initial burden, the burden then shifts to the nonmoving party, who "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). "[T]he mere existence of a scintilla of evidence in support of the [nonmoving party's] position will be insufficient [to defeat a motion for summary judgment]; there must be evidence on which the jury could reasonably find for the [nonmoving party]." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986).

## IV.  ANALYSIS

In order to establish a breach of contract under Michigan law, a plaintiff has the burden of proving:

>        (1)      a contract between the parties,
>        (2)      the terms of the contract require performance of a certain action,
>        (3)      a breach, and
>        (4)      the breach caused injury to the other party.

*Webster v. Edward D. Jones & Co.*, 197 F.3d 815, 819 (6th Cir. 1999).

As an initial matter, the Court notes that it is undisputed that the parties entered into an express contract on July 1, 2004, *i.e.*, the MSA, including the Service Orders and Attachments incorporated therein.  As discussed in the Court's July 6, 2011, Opinion and Order, "Plaintiff should have known when it filed the Complaint that Plaintiff did not have a viable breach of [express] contract action against Defendant for the period after January 2007 (or, at the latest, March 2007)"

6

and "it is . . . clear that any viable claim of Plaintiff with respect to the post-January 2007/March 2007 period must stem from something other than an express breach of contract claim (*i.e.*, the viable claim(s), if any, must be based on an implied contract/third-party beneficiary theory)."

The Court, after having reviewed the APA in conjunction with the parties' cross-motions for summary judgment, finds that the APA unambiguously provides that: (1) Plaintiff transferred the MSA to SME effective as of January 1, 2007 (APA, Section 4.1), but (2) Plaintiff retained all rights and claims "arising out of or relating to events occurring prior to the Closing[,]" which occurred on March 2, 2007 (APA, Section 1.2(f)).  Therefore, the Court concludes, as a matter of law, that Plaintiff's breach of express contract claim must be dismissed with respect to any and all Plaintiff-owned goods at issue that were handled by Defendant on or after March 2, 2007.  Conversely, the Court concludes, as a matter of law, that Plaintiff's claims for breach of implied contract, breach of implied contract for bailment, and breach of contract as third-party beneficiary of the assigned MSA are not viable for any period prior to March 2, 2007. *Eungard v. Open Solutions, Inc.*, 517 F.3d 891, 899 (6th Cir. 2008) (citing *Scholz v. Montgomery Ward & Co.*, 437 Mich. 83, 93 (1991) ("An implied contract cannot be enforced where the parties have made an express contract covering the same subject matter.")).

A.      **Breach of Express Contract Claim**

As discussed above, the MSA constituted an express contract governing the Plaintiff-owned goods handled by Defendant prior to March 2, 2007.[3]

Defendant argues that it is entitled to summary judgment on Plaintiff's express contract claim because no provision in the MSA, including Service Order No. 01 and the Attachments thereto, mandates that Defendant maintain proofs of delivery ("PODs") or provide PODs to Plaintiff upon Plaintiff's request.  Defendant is correct in its assertion that none of the relevant documents includes any language specifically requiring that Defendant retain PODs or provide PODs to Plaintiff upon

_____

[3]Plaintiff argues that the entire MSA could fail for indefiniteness because Attachment 4 (Performance Metrics) is unenforceable and Attachment 4 is essential to the MSA.  As discussed below, the Court rejects that argument.

request.  Defendant's argument is misplaced, however, because Plaintiff does not claim that Defendant breached its duties under the MSA by failing to maintain PODs or produce PODs to Plaintiff.  Rather, Plaintiff claims that Defendant breached the MSA by failing to deliver goods as required under the MSA.

Defendant next argues that it is entitled to summary judgment on Plaintiff's express contract claim because: (1) Michigan law provides that a warehouseman may limit its liability through contract, *see* M.C.L. § 440.7204, and (2) Defendant satisfied its standard of care under the MSA (and as a warehouseman) when it "met and exceeded" the Performance Metrics required under the MSA (Attachment 4).  Even if the Court assumes Defendant met or exceeded the Performance Metrics, however, Defendant's argument is overreaching.  First, contrary to Defendant's contention, the MSA contains no language that immunizes Defendant from, or otherwise limits Defendant's, liability because Defendant satisfied the Performance Metrics; rather, the Performance Metrics simply establish the levels of performance required under the MSA.  Second, even if Defendant met or exceeded the Performance Metrics, Defendant's performance could only constitute evidence that Defendant "exercised due care under the circumstances." *see Reliance Ins. Co. v. Ingersoll-Rand*, 2000 WL 33388436 (Mich.App. 2000) (citing *Columbus Jack Corp. v. Swedish Crucible Steel Corp.*, 393 Mich. 478, 486 (1975)).  Defendant's performance would not, however, establish as a matter of law that Defendant delivered Plaintiff-owned goods at issue in this case.

Defendant also argues that Plaintiff's "sole and exclusive remed[ies]" for Defendant's "failure to meet any of the Performance Metrics or otherwise provide the Services" are:

> (i) requiring [Defendant] at no cost to [Plaintiff] to re-perform the applicable Services to the extent necessary to correct such failure; or (ii) if remedying performance of the applicable Services is not possible, reimbursement to [Plaintiff] of any costs imposed upon it by DCC for failure to perform in accordance with Section 8 of Attachment 5; or (iii) payment of Service Level Credits.

*See* MSA, Attachment 4, Section 3.0; MSA, Section 2.03.  As Plaintiff failed to bring most, if not all, of its complaints regarding Defendant's alleged failure to perform until after Plaintiff transferred the MSA to SME, the remedies under parts (i) and (iii) are unavailable.  Defendant argues that, as

8

to the remedy set forth in part (ii), "there has been no claim by [Plaintiff] that any cost was imposed on [Plaintiff] by [DCC] because of [Defendant]'s failure to perform any services." Defendant ignores, however, the cost imposed on Plaintiff by DCC that resulted in this lawsuit, *i.e.*, the fact that DCC has not paid Plaintiff for certain Plaintiff-owned goods that Defendant allegedly: (1) received from third-party vendors, (2) should have delivered to DCC, but (3) allegedly failed to deliver to DCC. For those reasons, the Court concludes that Plaintiff is not foreclosed by the termination of the MSA (as between Plaintiff and Defendant) because Defendant can still "reimburse" Plaintiff for costs imposed on Plaintiff (*i.e.*, the absence of payment by DCC) for Defendant's alleged failure to perform under the MSA prior to March 2, 2007.

Defendant also contends that Plaintiff's claim for shrinkage damages is barred by the terms of the MSA because: (1) the MSA requires that Plaintiff provide Defendant with notice of shrinkage "contemporaneous with 'each occurrence'" (citing Service Order No. 01, Attachment 1, Section 7.0), and (2) Plaintiff did not provide Defendant with any notice of shrinkage at the time of the alleged occurrence but only did so when Plaintiff started sending Defendant summary invoices in June 2007. As set forth above, Section 7.0 of Attachment 1 to Service Order No. 01 provides, in its entirety:

> (a)     [Defendant] is liable for the value of items which are received at the DC [distribution center] but are not scanned and placed into a secure delivery tote.
> (b)     [Defendant] will implement a cycle count process to identify and reconcile inventory discrepancies on DCC owned inventory in the warehouse.
> (c)     [Defendant] will be liable for un-reconciled shrinkage in its DCs [distribution centers].
> (d)     [Defendant] to credit invoice [Plaintiff] after resolving each occurrence of shrinkage for the amount of difference.

As Section 7.0 clearly contains no language requiring Plaintiff to provide "contemporaneous" notice - or any notice - of shrinkage with each occurrence, the Court finds that Defendant wholly "misinterprets" Section 7.0 of Attachment 1 to Service Order No. 01.

Accordingly, and for the reasons set forth above, the Court denies Defendant's Motion for Summary Judgment as to Count I.

9

2.    *Plaintiff's Motion for Partial Summary Judgment*

Plaintiff argues that it is entitled to summary judgment on liability because Defendant has failed to produce documentation that evidences Defendant delivered the goods at issue. Specifically, Plaintiff contends that Defendant has failed to produce records that Defendant was obligated – pursuant to the terms of the MSA – to maintain and retain, *i.e.*, records that supported Defendant's performance of Services "and other matters relevant to the MSA." Plaintiff relies on Sections 3.04(b) and 6.02 of the MSA, as well as Section 5(b) of Attachment 5 to Service Order No. 01.

Section 6.02 of the MSA requires that: "A Party shall establish and retain for a period of seven (7) years following the performance of its obligations hereunder, records which adequately substantiate the applicability and accuracy of Charges payable hereunder and related expenses." Likewise, Section 3.04(b) of the MSA (involving audit rights) states: "Records that support [Defendant's] performance of the Services and other matters relevant to this Agreement will be retained by [Defendant] in accordance with Section 6.02." Finally, Section 5(b) of Attachment 5 to Service Order No. 01 provides that Defendant " must maintain complete and accurate records during the Service Order Term and for a period of seven (7) years after this [Service Order No. 01] is terminated." As such, the Court finds that the MSA unambiguously requires that Defendant had to maintain and retain documents that supported its performance of Services. As Defendant's representatives have acknowledged, PODs are documents that support the performance of Services by Defendant.

Plaintiff argues that since Defendant has not produced PODs, Defendant has failed to offer any evidence that the Services were performed *vis a vis* the goods at issue. Plaintiff's argument is misplaced, however, because the absence of the PODs does not establish, as a matter of law, that Defendant did not perform the Services. Rather, the absence of the PODs simply constitutes evidence that the Services were not performed. Moreover, in this case, there is also evidence that:

(1)    Plaintiff's and DCC's personnel failed to record delivery of goods at DCC,

10

(2)      DCC employees took and used MRO goods before they were entered into NPIC,[4]

(3)      "[P]roper procedures may not have always been followed at DCC plants" (Plaintiff's statement), and

(4)      Defendant "knew of 'receiving' issues at DCC and the alleged lack of 'robustness' of the WWT system" (Plaintiff's statement).[5]

These "receiving issues" and "deficiencies" constitute evidence that there may have been several reasons for DCC's refusal to pay Plaintiff for some or all of the goods at issue - *i.e.*, reasons other than a failure to deliver by Defendant. Accordingly, the Court cannot conclude, as a matter of law at the summary judgment stage, that the alleged non-delivery of goods to DCC was solely attributable to non-performance by Defendant.

Plaintiff next contends that because the quality of Defendant's performance was not "at least as high as the generally accepted standards and quality of work in the industry" (as required by Section 2.04 of the MSA), Defendant breached the MSA. Plaintiff relies on the declarations of "expert" Robert C. Kennedy ("Mr. Kennedy"),[6] which Plaintiff offers for the purpose of interpreting/defining certain terms of the MSA. Specficially, Mr. Kennedy proposes to define what "generally accepted standards and quality of work in the industry" mean. Mr. Kennedy also opines that Defendant did not satisfy those industry standards when performing (or failing to perform) under the MSA. Defendant has not offered any "expert" regarding the applicable "generally

---

[4]NPIC was DCC's inventory database that Plaintiff and DCC used to account for and inventory MRO goods delivered to DCC plants.

[5]WWT was a third-party electronic inventory management system that, pursuant to the terms of the MSA, Defendant was required to use to track MRO goods from their arrival at one of Defendant's hubs until the time Defendant shipped the MRO goods to a DCC plant. The system involved a barcode being affixed to either an item itself or a box the item was in, and the barcode was to be scanned by Defendant personnel at various times, including: upon arrival at Defendant's hub, when the goods were placed on shelves at the hubs, when the items were picked from the shelves and placed into carts bound for DCC plants, and when the carts were placed onto trucks bound for plants.

[6]In its briefs, Defendant argues that Mr. Kennedy's testimony is inadmissible. As there is no motion pending before the Court regarding the admissibility of Mr. Kennedy's testimony, however, the Court does not address that issue herein.

accepted standards and quality of work in the industry."

Notwithstanding the absence of an adversarial expert, the Court concludes that Mr. Kennedy's opinions and Plaintiff's contention do not merit granting Plaintiff's motion for summary judgment. Even assuming that Mr. Kennedy will offer the only testimony as to the meaning of "generally accepted standards and quality of work in the industry," his conclusion as to whether Defendant satisfied those standards is nothing more than his opinion on that factual issue. In the event such a factual issue must be determined, the fact finder (in this case, the jury) must decide whether Defendant satisfied those standards. Plaintiff's own arguments acknowledges as much, as Plaintiff notes that Defendant's "arguments [regarding Mr. Kennedy's opinions] address the weight, not admissibility, of the opinions."

Finally, in an attempt to convert the MSA from an express contract to an implied contract, Plaintiff argues that Attachment 4 (Performance Metrics) to Service Order No. 01 is unenforceable. Plaintiff asserts that, because Plaintiff and Defendant contracted to negotiate specific performance metrics but never did so, the terms of Attachment 4 are indefinite and void. *See, e.g., Heritage Broadcasting Co. v. Wilson Commun., Inc.*, 170 Mich.App. 812, 819 (1988) (citation omitted) (a contract to make a contract in the future fails for indefiniteness if it leaves essential terms "to be agreed upon as the result of future negotiations"). In support of its argument, Plaintiff directs the Court to the following language in Section 1.0(a) of Attachment 4 to Service Order No. 01:

> [Defendant] will commit to setting mutually agreed upon [distribution center] specific performance metrics . . . and definitions and amounts for service level credits . . . and definitions for minimum service levels, expected service levels, service level tables, and critical service levels with [Plaintiff] within 6 months after operations commence at each [distribution center].

Thus, Plaintiff contends that the entire MSA fails for indefiniteness (if Attachment 4 is essential to the MSA) or, alternatively, Attachment 4 must be disregarded (if Attachment 4 is non-essential to the MSA).

The Court concludes that it is unnecessary to determine whether Attachment 4 is essential to the MSA, however, because it concludes that the performance metrics in Attachment 4 are defined

12

and Attachment 4 is enforceable.  Notably, in its analysis of Attachment 4, Section 1.0(a), Plaintiff "overlooked" the sentences of Section 1.0(a) immediately following the sentence Plaintiff cited. Those ensuing Section 1.0(a) sentences provide (emphasis added):

> [Defendant] will perform the Services at or above the Performance Metric Levels. **The sample Performance Metrics set forth below (hereinafter referred to as "Sample Performance Metrics") will act as a guideline until the Parties reach an agreement on acceptable Performance Metrics.** Generally, the Performance Metrics will be understandable, quantifiable, and reasonable but not obtainable without true diligence to the Services. **Until acceptable Performance Metrics are agreed upon, [Defendant]'s non-compliance with the Sample Performance Metrics will be considered a "Service Level Failure" as per the terms of Section 3.0 of this Attachment 4.**

As the bolded language reflects, the parties did agree upon, and Defendant was bound by, certain specific performance metrics pursuant to which Defendant was to perform the Services required under the MSA.  The fact that the performance metrics expressly identified in Section 1.0(a) were "sample" or interim performance metrics does not detract from their definiteness or enforceability. As the language clearly states, the "Sample Performance Metrics" would govern until "acceptable Performance Metrics" were agreed upon.  Accordingly, the Court concludes that neither Attachment 4 nor the MSA itself is unenforceable for indefiniteness of Attachment 4.

For the reasons set forth above, the Court denies Plaintiff's Motion for Partial Summary Judgment as it relates to Count I.

*3.     Conclusion*

For the reasons set forth above, the Court concludes that there are genuine disputes regarding material facts central to determining the viability of Plaintiff's breach of express contract claim. Accordingly, the Court holds that neither party is entitled to summary judgment with respect to Count I.

**B.     Third-Party Beneficiary**

"A person is a third-party beneficiary of a contract only when that contract establishes that a promisor has undertaken a promise 'directly' to or for that person." *Schmalfeldt v. North Pointe Ins. Co.*, 469 Mich. 422, 428 (2003) (citing M.C.L. § 600.1405).  A plaintiff "must demonstrate that

13

the parties to the agreement intended to do, or refrain from doing, something directly for [plaintiff's] benefit." *Alcona Comm. Schls. v. Michigan*, 216 Mich.App. 202, 205 (1996). "[O]nly intended, not incidental, third-party beneficiaries may sue for a breach of a contractual promise in their favor." *Schmalfeldt*, 469 Mich. at 427. "The test created by [M.C.L. § 600.1405] is objective; the subjective intent of the parties to the contract is irrelevant." *Alcona*, 216 Mich.App. at 205 (citation omitted).

In this case, Plaintiff has submitted no evidence that Defendant had "undertaken a promise 'directly' to or for" Plaintiff. Significantly, after Plaintiff transferred the MSA to SME, the only parties to the MSA were SME and Defendant. Plaintiff has offered no evidence of any language in the APA or any other document that could be construed as granting Plaintiff third-party beneficiary status under the MSA or in any other manner. In addition, the Court finds the case on which Plaintiff relies to support its argument (*Vanerian v. Charles L. Pugh Co., Inc.*, 279 Mich.App. 431 (2008)) to be distinguishable. First, in *Vanerian*, defendant and a subcontractor entered a contract for services to be performed to the plaintiff's home. In this case, SME and Defendant contracted for services to be performed for DCC (not Plaintiff). Second, in *Vanerian*, the contract expressly referenced the plaintiff. Here, nothing in the APA, namely the assignment of the MSA, referenced services that Defendant would continue to perform for Plaintiff after the APA was signed.

Accordingly, and for the foregoing reasons, as to Count II (Breach of Contract - Third-party Beneficiary), the Court grants Defendant's Motion for Summary Judgment and denies Plaintiff's Motion for Partial Summary Judgment.

## C.    Implied Contract

"Courts recognize implied contracts where the parties assume obligations by their conduct." *Williams v. Unit Handling Systems Div. of Litton Systems, Inc.*, 433 Mich. 755, 758 (1989). "[While] [t]he essential elements of a contract are parties competent to contract, a proper subject matter, legal consideration, mutuality of agreement, and mutuality of obligation, . . . [a]n implied contract must also satisfy the elements of mutual assent and consideration." *Mallory v. Detroit*, 181 Mich.App. 121, 127 (1989) (citation omitted). "An implied-in-fact contract requires a meeting of

14

the minds, though it is established through words or conduct." *Van Dyke Partners, L.L.C. v. City of Warren*, 2010 WL 5383519, at *3 (Mich.App. 2010).

> A contract implied in fact arises under circumstances which, according to the ordinary course of dealing and common understanding, of men, show a mutual intention to contract. A contract is implied in fact where the intention as to it is not manifested by direct or explicit words between the parties, but is to be gathered by implication or proper deduction from the conduct of the parties, language used or things done by them, or other pertinent circumstances attending the transaction.

*Sutton v. Cadillac Area Pub. Schls.*, 117 Mich.App. 38, 45 (1982) (quotations and internal citations omitted).   For a promise to be supported by consideration, a plaintiff must demonstrate the following:

> (a)    The promisee must suffer legal detriment; that is, do or promise to do what he is not legally obligated to do; or refrain from doing or promise to refrain from doing what he is legally privileged to do.
>
> (b)    The detriment must induce the promise.  In other words the promisor must have made the promise because he wished to exchange it at least in part for the detriment to be suffered by the promisee.
>
> (c)    The promise must induce the detriment.  This means in effect . . . that the promisee must know of the offer and intend to accept.

*Romero v. Buhimschi*, 2007 WL 2902896, at *13 (E.D. Mich. 2007) (citing *Lawrence v. Ingham Cty. Health Dept.*, 160 Mich.App. 420 (1987) and *Allegheny College v. Nat'l Chautauqua Co. Bank*, 159 N.E. 173 (1927)).

  1.    *Defendant's Motion for Summary Judgment*

Defendant argues that the Court should determine, as a matter of law, that no implied contract existed between Plaintiff and Defendant on or after March 2, 2007, because Plaintiff paid no consideration to Defendant and there was no intent by Plaintiff to enter into an implied contract with Defendant.

Defendant first contends that, because Plaintiff did not pay Defendant for anything after March 1, 2007, there was no consideration for any implied contract because Plaintiff suffered no detriment to induce Defendant to perform under an implied contract. It is undisputed that beginning March 2, 2007, SME, not Plaintiff, paid Defendant for services provided by Defendant. As Plaintiff

15

argues, however, consideration for a contract may be provided by a third party. *Behrens v. Apessos*, 39 Mich.App. 426, 429 (Mich.App. 1972) ("That consideration moves to or from a third party is immaterial"). *See also* 1 Restatement, Contracts, § 75 ("Consideration may be given to the promisor or to some other person.  It may be given by the promisee or by some other person."); Williston on Contracts § 7:20 ("as long as the promisor has received the performance or return promise it bargained for, within the terms of its offer, there simply is no difference whether that consideration is furnished by the promisee or by some third person.").

Defendant next argues that there was no intent by Plaintiff to enter into any relationship with Defendant on or after March 2, 2007, as Defendant did not provide any services to Plaintiff and Plaintiff did not request any services from Defendant thereafter.  Defendant contends that: (a) the APA clearly and unambiguously provided that Plaintiff was transferring all of its rights in the MSA to SME, and  (b) Plaintiff failed to provide for any continuing relationship with Defendant after the APA closed, even though Plaintiff negotiated transition agreements with DCC and SME. Defendant's argument, however, ignores the evidence in the record that, among other things: (1) even after March 1, 2007, the MRO goods that were being delivered under the MSA were Plaintiff-owned goods, and (2) Defendant not only handled Plaintiff-owned goods after March 1, 2007, but Defendant knew that it was handling Plaintiff-owned goods thereafter.

Because SME paid Defendant for Services under the MSA as of March 2, 2007, and as such Services included Defendant's acceptance and delivery of Plaintiff-owned goods, the Court concludes that there is a genuine dispute as to whether: (a) Defendant received consideration for services related to Plaintiff-owned goods on and after March 2, 2007, and (b) there was a meeting of the minds (mutual assent) between Plaintiff and Defendant regarding Defendant's handling of Plaintiff-owned goods on or after March 2, 2007.  Therefore, the Court denies Defendant's Motion for Summary Judgment with respect to Plaintiff's breach of implied contract claim.

2.    *Plaintiff's Motion for Partial Summary Judgment*

Plaintiff argues that an implied contract was formed because: (i) Defendant's "conduct

16

receiving, shipping, and handling [Plaintiff]-owned goods, as well as [Defendant]'s cooperation with [Plaintiff] in obtaining documentation establishing disposition of [Plaintiff]-owned goods from 2005 through 2008, establishes the implied contract between the parties[, and (2) Defendant] accepted payment for its services during the duration of [Plaintiff]'s involvement." Even accepting such representations as true, however, the Court concludes that it cannot, as a matter of law, find that an implied contract exists or, as Plaintiff desires, conclude that Defendant is liable under an implied contract.

First, although there is evidence that Defendant may have known that it continued to handle Plaintiff-owned goods on or after March 2, 2007, there is also testimony that Defendant was not aware that the goods it handled in performing under the MSA once all rights were transferred from Plaintiff to SME (*i.e.*, after March 1, 2007) were Plaintiff-owned goods. Therefore, for that reason alone, there is a genuine dispute of material fact regarding the existence of an implied contract. Second, even if: (a) an implied contract existed on or after March 2, 2007, and (b) Defendant had bailee and/or warehouseman duties to Plaintiff pursuant to Michigan statutes, Plaintiff's motion for summary judgment on liability *vis a vis* its implied contract claim fails for most, if not all, of the reasons the Court denied Plaintiff's motion for partial summary judgment on the express contract claim. Most significantly, the conflicting evidence as to the various reasons why DCC did not "receive" Plaintiff-owned goods for which Plaintiff sought payment from DCC (*i.e.*, non-delivery of goods by Defendant, the use of goods by DCC employees, the failure of Plaintiff and DCC personnel to record such goods into NPIC, etc.) precludes a finding by the Court that Plaintiff is entitled to judgment as a matter of law on its implied contract claim.

Therefore, for the reasons set forth above, the Court denies Plaintiff's Motion for Partial Summary Judgment as to Plaintiff's breach of implied contract claim.

*3.   Conclusion*

For the reasons set forth above, the Court finds that there is a genuine dispute of material fact with respect to Plaintiff's breach of implied contract claim (Count III). Accordingly, the parties'

cross-motions for summary judgment are denied with respect to Count III.

**D.    Implied Contract for Bailment**

For the same reasons set forth in Section IV.C., the Court finds that there is a genuine dispute of material fact with respect to Plaintiff's breach of implied contract for bailment claim (Count IV). Accordingly, the Court denies both parties' motions for summary judgment with respect to Count IV.

**E.    Other Arguments**

*1.    Spoliation by Defendant*

Plaintiff asserts that Defendant's transfer of MRO records to DCC, without notice to Plaintiff and after requested by Plaintiff, renders such records spoliated. **Plaintiff contends that, as a result of this spoliation, the Court should enter judgment in favor of Plaintiff to punish Defendant for its conduct – or, in the alternative, rule that Plaintiff "is entitled to an adverse inference that the records do not exist" (because if the records did exist, Defendant would have provided them when asked by Plaintiff).**

"Spoliation is the destruction or significant alteration of evidence, or the failure to preserve property for another's use as evidence in pending or reasonably foreseeable litigation." *Forest Labs., Inc. v. Caraco Pharm. Labs., Ltd.*, 2009 WL 998402, at *1 (E.D. Mich., April 14, 2009) (quoting *West v. Goodyear Tire & Rubber Co.*, 167 F.3d 776, 779 (2nd Cir. 1999)). Among other elements required to prove spoliation, a plaintiff must show that the documents were destroyed with a culpable state of mind. *Forest Labs*, 2009 WL 998402, at *1 (citing *Residential Funding Corp. v. DeGeorge Fin. Corp.*, 306 F.3d 99, 107 (2nd Cir. 2002)).

In this case, it is undisputed that Defendant transferred the MRO records it maintained *vis a vis* the MSA to DCC in or about June 2009. The Court is not persuaded by Plaintiff's argument that Defendant's transfer of MRO records to DCC (a party adverse to Plaintiff) "is akin to destruction" of those records. Rather, because it is undisputed that: (1) the MRO records continue to exist, (2) Plaintiff has had access to those records, and (3) Plaintiff has, in fact, reviewed at least

18

some of those records, the Court concludes that such MRO records have not been destroyed or significantly altered.  Accordingly, the Court denies Plaintiff's request for relief with respect to alleged spoliation of evidence by Defendant.

       2.    *DCC's Failure to Pay After December 10, 2007*

Defendant contends that, because DCC stopped paying Plaintiff for goods in December 2007, any failure by Defendant to produce PODs in response to requests made after December 10, 2007 could not be a proximate cause of Plaintiff's failure to receive payment because DCC would not have paid Plaintiff in any event.  This argument fails because there could be many reasons that DCC did not pay Plaintiff after December 10, 2007.  Most significantly, as the present motions reveal, one of those reasons could be Plaintiff's failure to produce evidence to DCC that the goods at issue were delivered to DCC – namely, goods that Defendant received and claimed to have delivered to DCC but DCC denied receipt of the same.  Thus, as Plaintiff reasonably argues, if Defendant had produced PODs for such goods, Plaintiff could have proven to DCC that the goods were delivered and, accordingly, been paid by DCC for such goods.

For the foregoing reasons, the Court rejects Defendant's request that the Court rule, as a matter of law, that Defendant could not have proximately caused any harm to Plaintiff with respect to DCC's refusal to make any payments to Plaintiff after December 10, 2007.

       3.    *PODs Requested After January 1, 2007*

Defendant argues that any request for PODs made by Plaintiff on or after January 1, 2007 should be dismissed because Plaintiff transferred the MSA to SME as of that date.  The Court is not persuaded by Defendant's argument, whether such requests relate to PODs for Services performed (or not performed) while Plaintiff was a party to the MSA and/or reserved certain rights thereunder (*i.e.,* prior to March 2, 2007) or for services that were provided pursuant to an implied contract thereafter (if the fact finder determines there was such a contract between Plaintiff and Defendant). First, as to any Services performed (or not performed) by Defendant prior to March 2, 2007, Defendant fails to direct the Court to any language in the MSA which prohibits a party from seeking

19

relief, after the MSA terminated, for (non)performance during the term of the MSA.  Likewise, Defendant has submitted no legal authority in support of the proposition that, once an agreement terminates, a party forfeits all rights to sue the other party for the other party's non-performance during the term of the agreement.  Second, if it is determined that an implied contract (and/or implied contract for bailment) existed between Plaintiff and Defendant at any time, PODs would be relevant with respect to Defendant's duty, as a bailee and warehouseman, to deliver Plaintiff-owned goods. *See, e.g.*, M.C.L. § 440.7403.

Therefore, for the foregoing reasons, the Court rejects Defendant's assertion that any requests for PODs made after January 1, 2007, must be barred.

4.      *Doctrines of Laches and Equitable Estoppel*

Defendant argues that the doctrines of laches and equitable estoppel should operate to bar some or all of Plaintiff's breach of contract claims because Plaintiff: (a) waited too long to begin requesting "PODs for transactions that occurred months or years before," and (b) sent "cumulative invoices years after the alleged shrinkage occurred."

"An equitable estoppel arises where (1) a party by representations, admissions, or silence intentionally or negligently induces another party to believe facts, (2) the other party justifiably relies and acts on this belief, and (3) the other party will be prejudiced if the first party is permitted to deny the existence of the facts." *Hughes v. Almena Twp.*, 284 Mich.App. 50, 78 (2009).  Laches is an equitable defense that may apply when the passage of time in bringing a claim will be prejudicial to defendant.  "For laches to apply, inexcusable delay in bringing suit must have resulted in prejudice." *Tenneco, Inc. v. Amerisure Mut. Ins. Co.*, 281 Mich.App. 429, 457 (2008).  Accordingly, to prevail under either doctrine, a party must demonstrate that it has been prejudiced.

a.      PODs

As discussed above, Section 3.04(b) of the MSA, Section 6.02 of the MSA, and Section 5(b) of Attachment 5 to Service Order No. 01, respectively require that Defendant "shall establish and retain for a period of seven (7) years:" (1) "[r]ecords that support [Defendant's] performance of the

Services and other matters relevant to" the MSA; (2) "records which adequately substantiate the applicability and accuracy of Charges payable hereunder and related expenses;" and (3) "complete and accurate records." The MSA was effective as of July 1, 2004. This lawsuit was filed on September 16, 2009. Accordingly, pursuant to Sections 3.04(b) and 6.02 of the MSA, as well as Section 5(b) of Attachment 5 to Service Order No. 01, as of the date this lawsuit was filed (*i.e.*, about five years after the effective date of the MSA), Defendant was still obligated to have "retain[ed]" all such records. In its Motion for Summary Judgment, Defendant primarily focused on POD requests that Plaintiff made in March 2009. Although March 2009 was, as Defendant noted, "well after the MRO Program had ended," it was also approximately six months before this lawsuit was filed and over two years before Defendant's seven-year obligation began to expire. Defendant has not complained of any requests for PODs made by Plaintiff outside the seven-year limitations period - and Defendant cannot validly do so for any request made prior to July 1, 2011.

Therefore, based on the facts that: (1) Defendant was obligated to retain records for seven years, and (2) the seven-year retention period for records related to performance under the MSA could not have expired until, at the earliest, July 1, 2011, the Court concludes that Defendant was not, and could not have been, prejudiced by any of Plaintiff's requests for PODs that Defendant has identified.

           b.    <u>Shrinkage</u>

Defendant complains that Plaintiff "knew of . . . any shortfalls in delivered inventory as soon as the MRO Program began in late 2004 or early 2005" but "waited until mid-2007, after it had transferred the MSA to SME, after literally millions of new product had passed through the hubs, to bring any claim of shrinkage." As set forth above, Defendant was obligated to retain for seven years the records that would support the Charges it submitted to Plaintiff and that seven-year period did not expire until two years after this lawsuit was filed. Moreover, at least one of Defendant's representatives (Melissa Laitis) testified at her deposition that the passage of time did not affect Defendant's ability to retrieve such records. Therefore, the Court concludes that Defendant was not

prejudiced, as a matter of law, with respect to resolution of the dispute regarding shrinkage, even if Plaintiff did not notify Defendant of the alleged shrinkage until after Plaintiff transferred the MSA to SME in 2007.

## V.  CONCLUSION

Accordingly, and for the reasons set forth above, the Court hereby ORDERS that Defendant's Motion for Summary Judgment (Docket #69) is GRANTED IN PART (as to Count II) and DENIED IN PART (as to Counts I, III and IV), and Plaintiff's Motion for Partial Summary Judgment (Docket #92) is DENIED in its entirety.

IT IS SO ORDERED.

s/Lawrence P. Zatkoff
LAWRENCE P. ZATKOFF
UNITED STATES DISTRICT JUDGE

Dated: September 29, 2012